[J-65-2025] [MO: Donohue, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | | |
|---|---|---|
| SAMSUNG FIRE AND MARINE INSURANCE CO., LTD (U.S. BRANCH); HARLEYSVILLE PREFERRED INSURANCE COMPANY | : : : : : : | No. 61 EAP 2024<br><br>Petition for Certification of Question of State Law from the United States Court of Appeals for the Third Circuit at No. 23-1988 |
| v. | : : : : | ARGUED: November 18, 2025 |
| RI SETTLEMENT TRUST; ACE PROPERTY AND CASUALTY INSURANCE COMPANY; NATIONWIDE MUTUAL INSURANCE COMPANY; PHILADELPHIA INDEMNITY INSURANCE COMPANY; CAPITOL SPECIALTY INSURANCE CORPORATION | : : : : : : : : : | |
| APPEAL OF: RI SETTLEMENT TRUST | : | |

## CONCURRING OPINION

**JUSTICE WECHT**                                **DECIDED: July 21, 2026**

I join the Majority Opinion in full. The Third Circuit asks this Court to address whether there is "an overriding public policy" against sex trafficking under *Minnesota Fire & Casualty Company v. Greenfield*[1] that abrogates an insurer's contractual duty to defend its insureds—the owners, operators, and managers of the Roosevelt Inn. The Majority correctly answers this question in the negative. *Greenfield* is a non-precedential plurality opinion.[2] As such, *Greenfield* cannot be the precedential basis to abrogate an insurer's

---

[1] 855 A.2d 854 (Pa. 2004).

[2] Maj. Op. at 21.

duty to defend its Policyholders.[3]  The Majority appropriately and narrowly answers the first question certified to this Court by the Third Circuit.

In addition to being a non-precedential decision, *Greenfield* also is limited by its own terms to the circumstances of that case.  More importantly, in my view, the *Greenfield* Opinion Announcing the Judgment of the Court ("OAJC") is wrong as a matter of law.  I take this opportunity to elucidate subsidiary legal matters that are fairly subsumed within the first certified question.[4]

At the relevant times, the Policyholders were insured by various insurance companies through commercial general liability policies and an umbrella policy that insured against legal liability for bodily injury and property damage, including claims that third parties allegedly caused bodily injury to people on the premises.[5]  The Samsung and Nationwide policies generally insured against legal liability for any "bodily injury" caused by an "occurrence" or an incident of "personal and advertising injury."[6]  These policies defined an "occurrence" to mean "an accident, including continuous or repeated exposure

---

[3]  The Policyholders are UFVS Management Company, LLC, Roosevelt Motor Inn, Inc., and Roosevelt Inn, LLC.  The RI Settlement Trust was established in bankruptcy proceedings to assume liability for tort claims brought against the Policyholders.

[4]  *See Off. Comm. of Unsecured Creditors of Allegheny Health Educ. & Rsch. Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 327 (Pa. 2010) ("Therefore, it will be our practice to confine ourselves as closely as possible to the certified questions, including in our treatment only subsidiary legal matters fairly subsumed within those certified issues.").

[5]  The primary insurance companies include Harleysville Preferred Insurance Company, Nationwide Mutual Insurance Company, and Samsung Fire and Marine Insurance Company.  Ace Property and Casualty Insurance Company provided commercial umbrella liability insurance.  I refer collectively to these entities as "Insurers."

[6]  Br. of Appellees at 7 (citing Reproduced Record ("R.R.") at 469a, 614a, 816a, 820-21a, 960a, and 1121a).

to substantially the same general harmful conditions."[7] The polices excluded coverage for bodily injuries expected or intended from the standpoint of the insured.[8]

None of the primary insurance policies include sexual assault or abuse endorsements or exclusions. The umbrella policy issued by Ace contained an exclusion for injuries resulting from (1) the abuse or molestation of minors in the care, custody, or control of the Policyholders, and (2) negligent supervision or investigation of, or failure to report on, employees whose conduct would be excluded under (1).[9]

The underlying plaintiffs filed complaints against the Policyholders for damages resulting from sex trafficking.[10] The Insurers filed a federal declaratory judgment action in the United States District Court for the Eastern District of Pennsylvania seeking a declaration that they had no duty under Pennsylvania law to defend or indemnify the Policyholders in the underlying action. The Insurers' arguments were twofold. First, they relied upon the language of their insurance policies. Second, they argued that, even if the four corners of their respective policies impose a duty to defend or indemnify the Policyholders, Pennsylvania has a public policy against sex trafficking that abrogates

---

[7]     *Id.* (citing R.R. at 816-17a, 829a).

[8]     *Id.* (citing R.R. at 470a, 615a, 817a, 961a, 1806a).

[9]     *Id.* at 8-9 (citing R.R. at 1322a, 1399a, 1474a). As the Third Circuit observed, this exclusion likely would not come into play in the underlying litigation because the policy states that it is "no broader" than the primary insurance policies. *Samsung Fire and Marine Ins. Co. et al v. RI Settlement Trust et al*, 23-1988, 2024 WL 4921644, *3 n.5 (3d Cir. Aug. 12, 2024). Here, the primary insurance policies contained no such exclusion.

[10]     The plaintiffs in the underlying actions are four women who allege that, when they were minors, they were the victims of sex trafficking at the Roosevelt Inn. Each plaintiff filed a civil complaint against the Policyholders in federal district court. The complaints alleged facts that, if true, would establish negligence on the part of the Policyholders. For example, in the complaint filed by K.R., the plaintiff alleged that she was forced by sex traffickers to engage in commercial sex acts at the Roosevelt Inn, and that the Insureds knew of should have known that this was happening. K.R. Complaint at ¶¶ 38-75, R.R. 404-09a). The complaints do not allege criminality by the Policyholders.

those contractual obligations. The basis of this purported overriding public policy is Pennsylvania's anti-trafficking law. This statute criminalizes: (1) harboring or maintaining (among other things) a person with reckless disregard to the fact that she will be subject to sex trafficking; and (2) knowingly benefiting from such trafficking.[11] The Policyholders, in turn, relied upon the language of the insurance policies and the Insurers' duty to defend in civil actions alleging conduct that is potentially negligent, intentional, or criminal.

Relying upon *Greenfield*, the federal district court agreed with the Insurers and held that "it is against public policy to provide insurance for loss attributable to particularly harmful criminal conduct."[12] Despite the complaints' assertions of negligence, the district court surmised that the complaints alleged conduct that would be considered criminal, in violation of Section 3011. The district court viewed the complaints as alleging that the Insureds knowingly benefited from sex trafficking.

On appeal, the Third Circuit certified two questions of state law for this Court's resolution, the first of which is dispositive. This question asks whether Pennsylvania has an "overriding public policy" against sex trafficking premised upon *Greenfield* that abrogates an insurer's duty to defend and/or indemnify.[13] The Third Circuit indicated that it could not tell whether state public policy could abrogate an insurer's duty to defend and indemnify where the Policyholders' conduct may have violated Pennsylvania's anti-trafficking law.

The predicate of the certified question is *Greenfield*. As a plurality decision, *Greenfield* is not precedential and cannot resolve any legal question.[14] However,

---

[11] 18 Pa.C.S. § 3011.

[12] *Samsung Fire and Marine Insurance, Co. Ltd. v. UFVS Management Company, LLC*, 2023 WL 2574971, at *8 (E.D.Pa. Mar. 20, 2023).

[13] *See* Maj. Op. at 2.

[14] *Id.* at 21.

*Greenfield* was the foundation of the district court's ruling. And the Third Circuit viewed *Greenfield* as controlling precedent for the proposition that "overriding public policy" can negate an insurer's duty to defend an insured against allegations of criminal conduct, even if the insured is not alleged to have "intended by his act to produce the damage which did actually occur."[15] Because these federal courts have viewed *Greenfield* as controlling authority for the legal question before us, that decision is worthy of further comment.

In *Greenfield*, Michael J. Greenfield had a homeowners insurance policy with Minnesota Fire and Casualty Company. Greenfield also had a daily heroin habit. He had repeatedly used heroin with, and sold heroin to, Angela Smith. On one occasion, Greenfield provided heroin to Smith in his home. Smith overdosed and died. The Commonwealth charged Greenfield criminally for Smith's death. Greenfield pleaded guilty and was sentenced to a term of incarceration. Smith's parents, as administrators of Smith's estate, later sued Greenfield in tort, seeking damages for Smith's death. Minnesota Fire and Casualty Company filed a declaratory judgment action asserting that it had no obligation to defend or indemnify Greenfield under the homeowners insurance policy and, alternatively, asserting that public policy barred the insurance coverage demanded.

When the case ultimately was appealed to this Court, the OAJC agreed with Minnesota Fire and Casualty Company on public policy grounds.[16] The OAJC recognized that the Court previously had rejected the argument that allowing recovery under an

---

[15] *Samsung Fire*, 2024 WL 4921644, at *4 ("Pennsylvania law recognizes a policy-based exception to the duty to defend where an underlying complaint alleges criminal conduct so repugnant to society that it would violate 'overriding public policy' for an insurer to defend the insured, even if the insured is not alleged to have 'intended by his act to produce the damage which did actually occur.'") (citing *Greenfield*, 855 A.2d at 866).

[16] *Greenfield*, 855 A.2d at 865.

insurance policy when property damage arose from the commission of a crime by the insured would contravene public policy.[17] In *Eisenman v. Hornberger*, the Court rejected the public-policy argument because the insurance policy at issue did not contain a "violation of law" exclusion and, under the facts of that case, there was no "overriding public policy which would preclude recovery."[18] Distinguishing *Eisenman*, the *Greenfield* OAJC held that, "in situations when an insured commits a criminal act, with respect to a Schedule I controlled substance, and unintended or unexpected injuries or losses occur as a result, whether by accident or negligence, public policy will not allow coverage under the contract of insurance."[19] By contrast, "in cases that do not involve a criminal act by an insured with respect to a Schedule I controlled substance," the OAJC stated, our decision in *Eisenman* would apply. Under the general *Eisenman* rule, the insurer would have to prove "that the insured intended by his act to produce the damage which did actually occur."[20] The *Greenfield* OAJC observed that heroin is a Schedule I controlled substance, with no permitted or legal use, and repeatedly limited its holding to criminal conduct by the insured with respect to a Schedule I controlled substance.[21]

---

[17]     *Id.*

[18]     264 A.2d 673, 674-75 (Pa. 1970).

[19]     *Greenfield*, 855 A.2d at 866.

[20]     *Id.*

[21]     *Id.* at 864-65 ("[T]here is no coverage under the Policy given that Greenfield and Smith were voluntary participants in a criminal transaction involving heroin, a Schedule I controlled substance, that directly caused Smith's death."); *id.* at 866 ("[W]e find that recovery is precluded for damages that arise out of an insured's criminal acts regarding a Schedule I substance, as a matter of overriding public policy."); *id.* ("[W]hen an insured commits a criminal act, with respect to a Schedule I controlled substance, and unintended or unexpected injuries or losses occur as a result, whether by accident or negligence, public policy will not allow coverage under the contract of insurance."); *id.* (offering the caveat that "cases that do not involve a criminal act by an insured with respect to a Schedule I controlled substance" will not implicate this public policy exception to (continued…)

*Greenfield* is problematic for many reasons. First, as noted, it is a non-precedential plurality decision. Second, *Greenfield* is factually distinguishable from the case before us, which does not involve a Schedule I controlled substance. It is apparent that the OAJC limited its holding to such circumstances.

Third, the OAJC's express limitation to Schedule I controlled substances is inconsistent with its own analysis. There is no reasoned basis to find public policy with regard to Schedule I controlled substances—and to use this public policy to rewrite the insurance contract for the benefit of the insurer—that would not equally be apparent with respect to any other conducted criminalized in the Crimes Code.[22]

Fourth, in *Greenfield*, the policyholder pleaded guilty to the crime that formed the basis of the public policy exception. Here, there has been no admission or finding of criminality. Nor has the Commonwealth even charged the Policyholders with a crime.

Fifth, in contrast to *Greenfield*, the Policyholders do not seek coverage for their own criminal conduct. The underlying complaints allege intentional crimes committed by third parties and facts that would establish Policyholders' negligence in turning a blind

insurance coverage); *id.* at 867 ("While we were 'loath to insert [a 'violation of law'] clause for the greater protection of the insurer' in *Eisenman*, public policy demands that we do so now and in every case where a loss has arisen from the insured's commission of a crime involving the sale, use, or possession of a Schedule I controlled substance." (citing *Eisenman*, 264 A.2d at 675); *id.* at 869 ("Given this clear enunciation of public policy regarding Schedule I controlled substances," the insurance company was not required to defend or indemnify Greenfield); *id.* ("[W]e will not countenance the turning of illegal activities regarding Schedule I controlled substances into money-making occasions.").

[22] Then-Chief Justice Cappy recognized as much in dissent: "While the majority purports to limit its public policy exception to situations in which an insured engages in illegal activity regarding Schedule I controlled substances, its underlying rationale for creating that limited exception could easily be extended to create exceptions for other illegal acts." *Greenfield*, 855 A.2d at 872 (Cappy, C.J., dissenting). Chief Justice Cappy reasoned that the "amorphous" application of a "limited" public policy exception has the capacity to create broad exceptions in other cases involving any conduct defined as illegal. And here we are—with Insurers relying upon *Greenfield*, and the Crimes Code, to argue for a public policy exception to insurance coverage.

eye to (and failing to prevent) that criminality. The allegations against the Policyholders of knowing conduct were pleaded in the alternative to allegations of negligence that the Policyholders "should have known" about sex trafficking on the premises. Unlike *Greenfield*, the Policyholders are not invoking insurance coverage for a complaint premised solely upon their criminal conduct.

Sixth, the *Greenfield* OAJC was predicated in part upon the reality that there is no lawful use of heroin.[23] By contrast, the liability insurance policies at issue in this case insure a hotel business and guarantee a defense against allegations of negligence in the operation of that lawful business. The criminal conduct alleged in the underlying complaints is that of the third-party sex traffickers, not the Policyholders. Unlike *Greenfield*, the Insurers are not being asked to insure a criminal enterprise.

Seventh, the *Greenfield* OAJC emphasized that both the insured and the victim illegally used heroin.[24] The OAJC was unwilling "to countenance" what it viewed as "turning of illegal activities regarding Schedule I controlled substances into money-making occasions."[25] By contrast, there are no allegations in this case that the victims of sex trafficking were complicit in their own trafficking.

Eighth, this Court implicitly limited the reach of *Greenfield* in *Erie Insurance Exchange v. Moore*, where we held that an insurance company has a duty to defend claims alleging injuries from the allegedly negligent shooting of a third person who

---

[23] *Greenfield*, 855 A.2d at 868-69 ("Our Commonwealth, from the legislature to the Secretary of Health, has made its policy on the illegality of heroin abundantly clear: 'heroin has a high potential for abuse, has no accepted medical use within the United States, and . . . is unsafe for use even under medical supervision.'").

[24] *Greenfield*, 855 A.2d at 869 ("Public policy does not allow recovery under an insurance contract where a willing and frequent participant in this type of criminalized activity dies as a result.").

[25] *Id.*

appeared unexpectedly during the course of a planned murder-suicide.[26]  We declined the insurer's invitation to invalidate the insurance contract on public policy grounds.[27]  We held instead that the duty to defend is not eliminated when a civil action alleging negligence shares certain allegations or acts with an underlying criminal case.

Our holding in *Moore*, declining to find an overriding public policy, put the onus on the insurer to exclude what it does not want to cover.  If the insurer in that case did not want to provide a defense and indemnification for incidents involving firearms or incidents that occur during the commission of a crime, it could have written such exclusions into the policy.  The same is true here.  If the underlying complaint alleged facts that come within the policy language, and there are no applicable exclusions, then there is an obligation to defend.  The Insurers are free to exclude what they do not want to cover.  The public policy exception envisioned by the plurality in *Greenfield* has nothing to say on the matter.

Ninth, Insurers seek to extend the *Greenfield* OAJC beyond the insured's criminal conduct at issue in that case to bar coverage for negligence claims herein.  Insurers characterize the Policyholders' conduct as ranging from reckless to intentional conduct in an attempt to analogize the facts of this case to those in *Greenfield*.  Insurers recognize, however, that the underlying complaints alleged negligence, negligent infliction of emotional distress, and negligent hiring and supervision.[28]  The facts asserted in the underlying complaints would establish the Policyholders' negligence, through their employees and agents, with regard to the criminal acts committed by third parties.  Each

---

[26]     228 A.3d 258 (Pa. 2020).

[27]     *Id.* at 262 (rejecting the contention that providing a defense would "conflict with Pennsylvania public policy . . . that liability insurance does not cover damages caused as a result of evil or illegal conduct").

[28]     Joint Br. of Appellees at 12-13.

complaint alleges that the Policyholders knew or should have known about the alleged injuries and wrongdoing.  The complaints seek damages for bodily injury alleged to have occurred in part because of this negligent conduct.  There is no basis in the *Greenfield* OAJC to relieve Insurers of their duty to defend against allegations of negligence.

This brings me to the most apparent flaw in the *Greenfield* OAJC, one that Chief Justice Cappy relied upon in dissent: creating a public policy exception requires "rewriting" the insurance company's contract of insurance in order to correct its "errors in business judgment"—something that is not the court's function.[29]  It is not some amorphous conception of public policy that defines or forgives an insurer's duties.  It is, rather, the terms of the insurance contract itself.

Whether a particular claim potentially is within the insurance policy's scope is answered by comparing the four corners of the policy with the four corners of the complaint.  An insurer has a broad duty to defend that is triggered whenever the "factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy."[30]  In making this assessment, the "factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured."[31]  Any doubt or ambiguity in this endeavor is resolved in the policyholder's favor.[32]

---

[29]     *Greenfield*, 855 A.2d at 872 (Cappy, C.J., dissenting).

[30]     *Moore*, 228 A.3d at 265 (quoting *Babcock & Wilcox Co. v. American Nuclear Insurers*, 131 A.3d 445, 456 (Pa. 2015)).

[31]     *American and Foreign Ins. Co. v. Jerry's Sport Center, Inc.,* 2 A.3d 526, 541, (Pa. 2010) (quoting *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742 (3d Cir.1999)); *see also Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999) (for purposes of establishing a duty to defend, the facts pled by the plaintiff are controlling).

[32]     *Moore*, 228 A.3d at 265; *Gene's Rest. Inc. v. Nationwide Ins. Co.*, 548 A.2d 246, 247 (Pa. 1988) ("In determining the duty to defend, the complaint claiming damages must (continued…)

Complaints that make allegations in the alternative are liberally construed in favor of the duty to defend. Defending their insureds against unproven allegations that encompass negligence is precisely what the duty to defend requires. If any of the allegations in the underlying complaints "potentially" or "might or might not" fall within coverage, the Insurers must defend all allegations and claims.[33]

Insurers focus exclusively upon the most egregious allegations made against the Policyholders in the underlying complaints and disregard the allegations sounding in negligence. It is enough to require coverage that the complaints allege negligence and accidents from the standpoint of the insureds. The Insurers' reading of the underlying complaint fails to construe the facts within the four corners of the complaint liberally in favor of the duty to defend.

In addition, public policy is a narrow exception to the duties created by a contract of insurance. When interpreting insurance policies to compare the coverage to the underlying complaints, we apply general principles of contract interpretation. "[A]n insurance policy is nothing more than a contract between an insurer and an insured."[34] We give effect to the contract's language if it is clear and unambiguous.[35] As a narrow exception to this rule of contract interpretation, courts will not enforce contracts that contravene public policy.[36] This doctrine may justify departure from contractual terms

---

be compared to the policy and a determination made as to whether, if the allegations are sustained, the insurer would be required to pay resulting judgment.").

[33] *Jerry's Sports*, 2 A.3d at 540-41.

[34] *Gallagher v. Geico Indem. Co.*, 201 A.3d 131, 137 (Pa. 2019).

[35] *Id.*

[36] *Central Dauphin School Dist. v. American Cas. Co.,* 426 A.2d 94, 96 (Pa. 1981) ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or if the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such (continued…)

only when the public policy is clearly expressed. "Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest:"[37]

> As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. . . . Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy. The courts must be content to await legislative action.[38]

Insurers ask us to speculate about the legislative intent undergirding the Crimes Code and to superimpose that intent onto private contracts of insurance for purposes of the void-for-public-policy doctrine. They rely in particular upon the Crimes Code to alleviate their contractual obligations when the Policyholders have not been adjudicated guilty of any crimes, have been alleged to have engaged in conduct that would establish negligence, and have paid premiums to the Insurers for coverage the Insurers now disavow.

---

terms.") (internal citation omitted); *Supervisors of Lewis Twp. v. Employers Mut. Cas. Co.,* 523 A.2d 719 (Pa. 1987) (holding that it is contrary to public policy to insure against willful or fraudulent conduct of a township official); *Safe Auto Ins. Co. v. Oriental-Guillermo*, 214 A.3d 1257, 1269-70 (Pa. 2019) (Wecht, J., concurring) ("[T]he rule that courts should not enforce contracts that are against 'public policy' is, of course, a well-established common law principle.").

[37]    *Hall v. Amica Mut. Ins. Co.*, 648 A.2d 755, 760 (Pa. 1994).

[38]    *Id.* (quoting *Muschany v. United States*, 324 U.S. 49, 66–67 (1945) (footnotes and citations omitted). The *Greenfield* OAJC likewise explained that "[o]nly dominant public policy justifies the invalidating of a contract on the basis of public policy." *Greenfield*, 855 A.2d at 867 (internal quotations omitted). To the OAJC, one source of "dominant public policy" is statutory enactments. *Id.* It is unclear the extent to which, in the view of the OAJC, public policy may be apparent and yet not be dominant or sufficient to override an insurance policy.

It is not the role of the courts to establish public policy, rooting around until we find a dominant public policy solely to let the insurance carriers out of the contractual obligations to which they freely agreed to be bound. To pitch the vague notion of "public policy" as a tool to override clear contractual language is to ask the courts to save the insurers from the consequences of their own actions. The public policy doctrine is "more than a vague goal which may be used to circumvent the plain meaning of the contract."[39] And it certainly is no sword to wield against unsuspecting policyholders who dutifully paid their premiums to secure the insurer's obligations to provide the precise coverage the Insurers now disclaim.

To be clear: Insurers are asking the courts to create an extra-contractual exclusion after the fact, and after the Insurers received compensation for the precise coverage they now abdicate. The Insurers go to great lengths to avoid extending the same coverage for which they were happy to receive premiums. There was a policy exclusion readily available in the marketplace that would preclude coverage for injuries resulting from the abuse of minors in the care or control of the insured, as well as negligent supervision of employees whose conduct resulted in the abuse of minors. There are also policy exclusions available for harm resulting from criminal conduct or a violation of the law caused by third parties. Insurers are free to draft policy exclusions to write around any other scenario they may choose to exclude. And insurance companies are sophisticated entities in the business of excluding coverage. Insurers in this case, who drafted the

---

[39] *Eichelman v. Nationwide Ins. Co.*, 711 A.2d 1006, 1008 (Pa. 1998); *see also Sayles v. Allstate Insurance Company*, 219 A.3d 1110, 1128-29, (Pa. 2019) (Wecht, J., dissenting) (opining that the resort to framing issues of statutory construction "euphemistically or vaguely as something rooted in 'public policy' . . . has created the misperception that jurists possess some inherent lordly authority to displace written agreements based upon our own idiosyncratic conceptions of what strikes us as desirable or undesirable 'public policy'").

policies and charged premiums based upon what the policies included and excluded, were free to include any exclusions they saw fit.

Had Insurers offered policies that provided the relevant exclusions, rather than relying upon notions of public policy to save them from their own drafting consequences, Policyholders would have been free to look elsewhere for more comprehensive coverage or to accept the exclusions offered and the reduced premiums they likely would entail. Although insureds have less bargaining power than insurers, insureds are acting as buyers in a free market and are free to shop around for different insurance policies that cover their liabilities. Once an insurer and an insured have agreed on what their insurance policy will and will not cover, the insured pays a commensurate premium for that agreed upon coverage. By contracting for coverage and accepting a premium predicated upon the contractual risks, the insurer is acting as a free economic actor. If a dispute later arises about what conduct has been insured, courts will enforce insurance contracts by their terms. If an insured has paid premiums to insure against liability, the insurer is bound by the terms of the insurance contract. Where the insurer is free to write around the risks it declines to cover, it is not for the courts to void the very contracts the insurers drafted.

Insurers here did not give Policyholders the option to shop the insurance market to choose policies that would provide the coverage they sought. Instead, Insurers purported to offer comprehensive liability coverage without exclusions that would pertain to the underlying conduct in this case, only to later ask the courts to relieve them of their own contractual obligations.[40] Were we to agree with Insurers, where would it end? Anytime there is criminal conduct alleged to have occurred, whether by the policyholder

---

[40] There may still be contractual reasons for the Insurers to deny coverage. Because the district court found that public policy barred coverage, it did not consider any other reason to deny coverage, including the lack of an occurrence as defined in the policies or the applicability of any policy exclusions.

or by third parties, the argument could be that public policy, as embodied in the Crimes Code, overrides plain contractual language.

Once the courts get into the business of advancing a purported public policy, they inevitably will run into a countervailing public policy. Were we to accept that the Crimes Code evidences public policy, how are courts to know whether the public policy is such that it is overriding? For every public policy one party may identify, there may be countervailing public policies at play. For example, Pennsylvania has a public policy in favor of a broad duty to defend, as reaffirmed in *Moore*.[41] The same can be said of the public policy favoring the enforcement of contracts, or the compensation of innocent crime or tort victims.

Insurers and insureds alike are entitled to the enforcement of their insurance contract. And the compensation of tort victims may not occur in the absence of insurance coverage. Insurers seek to leave trafficking victims—whose egregious treatment forms the basis of their public policy arguments—uncompensated.[42]

Insurers believe that, absent the finding of an "overriding public policy," the policyholders will be insulated from their own alleged criminal conduct. We have rejected this kind of argument before. An "insurance policy in no way saves the insured from the consequences of [a] criminal act" because "the sanctions of the criminal law and the coverage of the insurance policy address themselves to quite separate and distinct

---

[41]     228 A.3d at 267-68.

[42]     *Moore*, 228 A.3d 258, 267 (Pa. 2020) ("Denying a duty to defend under such circumstances would not serve as a crime deterrent, and would unnecessarily withhold compensation to tort victims"). As an example, the legislature has determined that public policy favors compensating the victims of automobile accidents through mandatory insurance coverage. *See* 75 Pa.C.S. §§ 1711-1738. Indeed, the public policy in favor of compensating tort victims mandates automobile insurance coverage for the injuries of victims of drunk drivers, even if the conduct that led to those injuries has been criminalized. *Id.*, § 1724.

actions on the part of the insured."[43]  If the insured's conduct amounted to criminal conduct that would warrant criminal penalties, those penalties would deter such misbehavior, more so than the prospect that the insurance policy may not cover damages for the victims.  If the potential loss of one's liberty as a sanction for criminal conduct is not a sufficient deterrent, it is doubtful that the risk of losing liability insurance coverage for the resulting harms will deter the insured.  What is certain is that invalidating liability insurance polices will result in victims losing compensation for harm committed against them.  Under Insurers' argument, we are expected to believe that a criminal would jeopardize his own liberty by endangering a victim because he knows that his insurer may compensate the victim.  This is nonsensical.

The potential liability of a negligent actor that results from the criminal or intentional conduct of a third party is well-established.  In *Feld v. Merriam*,[44] a tort plaintiff was sexually assaulted in a parking lot owned by a landlord who controlled the parking lot.  Examining the landlord's role in ensuring parking lot safety, this Court explained that, "when a landlord by agreement or voluntarily offers a program to protect the premises, [the landlord] must perform the task in a reasonable manner and where a harm follows a reasonable expectation of that harm, [the landlord] is liable."[45]  The duty shapes potential liability for defendants sued by plaintiffs injured by third party criminal conduct.  As the Insurers would have it, all of the potential cases that involve a combination of negligence and third-party criminal conduct could be vitiated on public policy grounds, and the tort plaintiffs left uncompensated.

---

[43]     *Eisenman*, 264 A.2d 673 at 675.

[44]     485 A.2d 742, 747 (Pa. 1984).

[45]     *Id.*

In *Donegal Mut. Ins. Co. v. Baumhammers*,[46] the policyholders' son engaged in a killing spree. The victims and their estates sued the policyholders, alleging various negligent acts. The policyholders were insured by a homeowners policy that insured against accidents. The insurance company asserted that it had no duty to defend because the shootings were not accidental, but rather the result of the intentional criminal conduct of the policyholders' son. This Court rejected this argument. From the perspective of the insureds, the claims asserted were predicated on an accident.[47] If the parents in *Baumhammers* received their paid-for insurance coverage notwithstanding the illegality of the murders committed by their son, why should the Policyholders here not receive their paid-for insurance coverage notwithstanding the criminality of the sex traffickers?

Similarly, in *Mohn v. American Casualty Company of Reading*,[48] the dependent son of the policyholder was shot and killed by a police officer. The policyholder sought reimbursement from his insurer for the expenses incurred in his son's hospitalization. This Court held that the decedent sustained an accidental injury, reasoning that the intent of a third party "does not preclude the occurrence from being an 'accident.'"[49] Rather, whether something is an accident depends upon the viewpoint of the insured, not the viewpoint of the third party actor who committed the act that caused the injury.[50]

---

[46]     938 A.2d 286 (Pa. 2007).

[47]     *Id.* at 293.

[48]     326 A.2d 346 (Pa. 1974).

[49]     *Id.* at 348.

[50]     *Id.*

In *Nationwide Mutual Fire Insurance Company of Columbus v. Pipher*,[51] the insured failed to install doors on an apartment before leasing the apartment to a tenant. The tenant was murdered in the apartment. The tenant's spouse brought a negligence action against the insured. The insurance company sought a declaration that, because the victim's death was the result of intentional acts by a criminal third party, there was no accident or occurrence that implicated the duty to defend or indemnify the insured. The Third Circuit rejected this argument. Instead, it held that an insurance company has a duty to defend its insured in a complaint alleging negligent conduct, even where a third party intentionally killed the plaintiff. From the perspective of the insured, the tenant's death was unexpected and fortuitous, and constituted an accident entitling the insured to coverage.[52] In each of these cases, the criminality of third parties did not defeat the contractual obligations of the insurance companies.

The Insurers characterize the Policyholders' attempts to obtain the coverage they paid for as "offloading [their] liability to its insurer."[53] That is not what is occurring. The insureds are invoking the policy coverage for which they paid. It is Insurers that are attempting to offload their own contractual obligations.

Justice McCaffery joins this concurring opinion.

---

[51]     140 F.3d 222 (3d. Cir. 1998).

[52]     *Id.* at 226.

[53]     Joint Br. of Appellees at 1; *id.* at 29.